# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Marleittia Whitacker-Reid,      :
            Appellant      :
                          :
        v.              :   No. 371 C.D. 2016
                          :   Argued:  October 17, 2016
Pottsgrove School District, Board of   :
School Directors               :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE JOSEPH M. COSGROVE, Judge
                HONORABLE JAMES GARDNER COLINS, Senior Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION**
**BY JUDGE COHN JUBELIRER**         **FILED:  February 9, 2017**

Marleittia Whitaker-Reid (Mother)[1] appeals from the Order of the Court of Common Pleas of Montgomery County (common pleas) that affirmed the adjudication of the Pottsgrove School District (District), Board of School Directors (Board) that excluded and expelled Mother's two children (Children) from the District on the basis that Mother did not reside in the District.  On appeal, Mother argues that:  (1) common pleas abused its discretion by not granting her a one-week continuance to allow her recently-acquired pro bono counsel to submit a brief on certain legal issues and by not considering those issues when they were

---

[1] Although Mother's Notice of Appeal spells her last name "Whitacker-Reid," it appears that the correct spelling is "Whitaker-Reid."

raised at oral argument before common pleas; and (2) the Board's findings of fact regarding her not residing in the District are not supported by substantial evidence.[2] Because there was not substantial evidence to support the Board's findings of fact, we reverse common pleas' Order.

## I.    Factual Background

Mother enrolled Children, Older Child in first grade and Younger Child in kindergarten, in the District for the 2014-2015 school year using the address 117 Butternut Drive, which is located in the District (District Address).  Mother previously had enrolled Older Child in the District for the 2013-2014 school year using the District Address.  The District Address is the residence of Octavia Durham, Mother's grandmother and Children's great-grandmother. (Adjudication, Findings of Fact (FOF) ¶¶ 1, 8.)  The District has a Policy and Administrative Regulation No. 200 (Policy), which requires that a student's district of residence is the school district in which the student's parent(s) reside. (Id. ¶ 2.)  In May 2014, the principal of Older Child's school sent a request for additional verification of her residency, to which Ms. Durham submitted additional documentation. (Id. ¶¶ 7-8.)  On September 11, 2014, a District resident contacted the District regarding Children's attendance in the District, which caused the District to investigate Children's residency. (Id. ¶ 11.)  Following an investigation, performed by District employees and "The Security Advisors Advanced Protection Division" (Investigators), the District concluded that Children and Mother did not reside in the District. (Id. ¶¶ 12-13.)

---

[2] We have reordered the issues.

2

On Friday, April 10, 2015, the District notified Mother by letter (Notice) of its determination that she and Children did not reside at the District Address and that a hearing before a Hearing Officer would be held on the following Wednesday, April 15, 2015, to determine her residency. (Supplemental Reproduced Record[3] (S.R.R.) at 29b-30b.) The Notice, which was sent by regular mail, certified mail, and hand delivery to Mother at the District Address, explained her due process rights for the hearing, as well as her appeal rights if she disagreed with the ultimate outcome, and identified whom the District could call as witnesses. (Id.)

The hearing was held as scheduled on April 15, 2015, and the Hearing Officer advised Mother that she had the burden of proving that she resided in the District. The District, represented by counsel, nevertheless agreed to present its evidence first. It offered the testimony of several witnesses, as well as documentary evidence, including: the Notice; notarized Multiple Occupancy Forms[4] (Form) for 2013-2014 school year; the May 1, 2014, residency verification letter sent from the District to Mother by certified mail; the letter from Ms. Durham, dated May 10, 2014, sent in response to the District's May 1, 2014 letter; a notarized Form, dated July 2, 2014, titled Resident's proof of residency with attachment signed by Ms. Durham; the February 2, 2015 report from the

---

[3] This is the document named "Reproduced Record of the Proceedings Conducted in . . . Common Pleas . . . (No. 2015-11933)" which contains the record made before the Hearing Officer and the hearing transcript of appellate argument before common pleas.

[4] The Form consists of an "Application for Multiple Occupancy Registration – Proof of Residency" that is completed by the parent or legal guardian of the child who is to be enrolled in a school district and who will be residing with a district resident, and a "Certification Multiple Occupancy – Proof of Residency" that is "completed by the resident who will be housing a non-resident on their property." (S.R.R. at 35b-36b.)

Investigators; notes and emails from District staff; and an attendance report for Children. (S.R.R. at 29b-58b.) Mother appeared pro se and offered her own testimony, as well as documents identifying the District Address as her address.

Roberta Oxenford, the District's Child Accounting Specialist, testified in relevant part, as follows.[5] To establish residency for enrolling a child in school, a parent has to present either a deed or lease and two utility bills for an address within the District or a notarized Form. She received a notarized Form for Older Child in August 2013, but did not have a Form for Children for the 2014-2015 school year with her at the hearing. However, based on the fact that Younger Child was enrolled as a kindergarten student, the Form should have been in his file, although she had not found it, was still searching her files for it, and she was "not sure" whether it was there. (Id. at 16b-17b.) In response to the Hearing Officer's question that "[y]ou think it exists, or you think it probably doesn't exist," Ms. Oxenford responded "[n]o, I think it probably exists somewhere." (Id. at 16b.)

David Gordon, who works for Investigators, testified as follows.[6] He went to the District Address on multiple occasions at various times and saw groups of children walking from the house to the bus stop. One day, he observed a woman, later identified as Mother by District employees, drive up to the District Address in a red vehicle registered to another person at an address on North Charlotte Street, Pottstown.[7] He observed Mother park in front of the District Address and enter the home; this was at a time of day after the Children had left for school. He went to

---

[5] Ms. Oxenford's testimony can be found at pages 13b-17b of the Supplemental Reproduced Record.

[6] Mr. Gordon's testimony can be found at pages 17b-19b of the Supplemental Reproduced Record.

[7] This is in the Pottstown School District.

4

the North Charlotte Street address and saw the red vehicle, but he never saw Mother at that address. Mr. Gordon could only observe the front entrance and side yard of the District Address and could not see the back door of the home.

Investigators' report was introduced as evidence.[8] The report revealed that a search performed "through proprietary investigative web sites" showed five potential addresses for Mother, one of which was the District Address. (Id. at 50b.) North Charlotte Street was not one of the potential addresses listed. Mother had obtained a Pennsylvania Identification Card with the District Address on May 13, 2014. Through surveillance, it was determined that Mother drove a red car registered at an address in Pottstown Borough, and that car was parked behind an apartment at that address. The report concludes that Mother does not reside at the District Address.

Jamie Slack and Elizabeth Rakoff, District social workers, testified as follows.[9] They surveilled the District Address several times between May 2014 and September 2014 around the time Children would be getting on the bus to go to school, but were not watching the District Address 24 hours a day. They did not see Mother, or any other adult, take Children to the bus stop and did not see her at the District Address. Ms. Rakoff also testified about Children's attendance reports noting that they had a number of absences on Mondays and Fridays or days preceding or following a school closing. She observed that Older Child was absent from school for 7 days, and Younger Child was absent, in addition to other days,

---

[8] Investigators' report can be found at pages 48b-51b of the Supplemental Reproduced Record.

[9] Ms. Slack's testimony can be found at pages 19b-21b of the Supplemental Reproduced Record. Ms. Rakoff's testimony can be found on page 21b of the Supplemental Reproduced Record.

the same 7 days, and both Children had the same 11 tardies. These patterns suggested to her a "residency concern." (Id. at 20b-21b.)

Renee Lloyd, attendance secretary at Children's elementary school, testified that there were certain patterns in their attendance that suggested a residency issue.[10] First, Younger Child was brought in late to school by Mother because he overslept, after which the school received a phone call from Ms. Durham when she received notice that Younger Child was absent from school (Tardy Incident). However, Ms. Lloyd agreed that it was possible that Ms. Durham may not have been home that morning and did not know that Younger Child had been taken into school late. Second, Ms. Durham brought Children to school late one day because she had to wash their clothing after an accident with cereal and they did not have many clothes at the house (Cereal Incident). When asked by Mother why this could not have meant that they just did not have any clean clothes available, Ms. Lloyd agreed it was possible, but she felt that they should have another pair of clean clothes available. Third, two students who were being picked up from school by Mother inquired about walking to Mother's residence, were hushed by Mother, and it appeared to Ms. Lloyd that Mother did not want the students to make that suggestion in Ms. Lloyd's presence (Walking Incident). However, Ms. Lloyd acknowledged that the walk from the school to the District Address was "doable" but would take more than an hour. (Id. at 22b.)

Mother, in presenting her case, stated that "as far as proof of my case, what is it that I need to prove? I live where I live, so I really don't know . . . what [you]

---

[10] Ms. Lloyd's testimony can be found at pages 22b-23b of the Supplemental Reproduced Record.

want me to say?"[11]   (Id. at 24b.)   Mother offered her public assistance documentation for 2014 and 2015, her 2014 W-2 form, and bank statements from September to October 2014 and January to February 2015, all of which listed the District Address as her address.  Mother testified that she has been living at the District Address for three years and that she has been having difficulty with the District regarding her residence the entire time.  Mother stated that she does not drive and has never driven so it could not have been her driving the red car; and she has no connection to the North Charlotte Street address.  The District's counsel indicated that he would show the video with the red car in rebuttal; however, following a recess, the District did not show the video and rested its case.

## II.   Hearing Officer's Adjudication and Board's Decision

Following the hearing, the Hearing Officer issued an Adjudication with findings of fact and conclusions of law, which found, in relevant part, as follows. Neither Mother nor Ms. Durham submitted either the required Forms for Children for the 2014-2015 school year or other documentation verifying Mother's residence at the District Address.  (FOF ¶¶ 3-4, 8-10.)  Based on the investigations performed by Investigators, Ms. Slack, and Ms. Rakoff, as well as the anecdotal observations of Ms. Lloyd, Mother does not reside at the District Address but at the North Charlotte Street address.  (Id. ¶¶ 13-22.)  Pursuant to Section 1301 of the Public School Code of 1949 (School Code),[12] 24 P.S. § 13-1301, the District "need

---

[11] Mother's testimony can be found at pages 24b-26b of the Supplemental Reproduced Record.

[12] Act of March 10, 1949, P.L. 30, as amended, 24 P.S. § 13-1301.  This section provides, in pertinent part, that "[e]very child, being a resident of any school district, between the ages of six (6) and twenty-one (21) years, may attend the public schools in his district, subject to the provisions of this Act."  Id.

only provide services to those eligible students who are residents of" the District. (Adjudication, Conclusions of Law (COL) ¶ 4.) Residency requires parent and child "to maintain[] a physical presence, such as where they stay during the days and nights, receive mail and phone calls, keep books, clothing, and supplies." (Id. ¶ 5.) The Hearing Officer concluded that "[a]lthough Mother provided proof of residency documentation in accordance with [the Department of Education's (Department) Basic Education Circular (BEC) on Enrollment]," she did not present "adequate evidence . . . [to] demonstrat[e] proof of residency." (Id. ¶¶ 10-12.) Instead, the District's evidence substantiated its determination that Mother was not a resident of the District and, therefore, "exclusion [was] the appropriate remedy." (Id. ¶¶ 13, 15.) Following the hearing before the Hearing Officer, Children moved to Philadelphia to live with their father and attend the Philadelphia School District. (S.R.R. at 101b.)

The Adjudication was presented to the Board at its April 28, 2015 meeting, and the Board passed a resolution approving and adopting the findings of fact, conclusions of law, and remedy suggested by the Hearing Officer. (Id. at 83b, 86b.) By letter dated April 29, 2016, sent to Mother at the District Address by certified mail and signed for by Mother, the Board advised her that it had adopted the Adjudication and that she had the right to appeal that determination. (Id. at 90b-91b.)

## III. Proceedings Before Common Pleas

Mother timely appealed on May 29, 2016, pro se, to common pleas and submitted a document that challenged numerous findings of fact. (Id. at 1b-7b.) Mother took no further action, and the District eventually filed a praecipe for oral

argument and submitted a brief to common pleas. On September 22, 2015, common pleas scheduled oral argument for January 27, 2016. On January 26, 2016, the day before oral argument, Mother obtained pro bono counsel and counsel requested a one-week continuance in order to file a brief. The District objected to the continuance, noting that it had expended significant funds in preparing for oral argument, which had been scheduled for four months, and that it, not Mother, had been moving the appeal proceedings along. Common pleas denied the continuance, and oral argument proceeded as scheduled. Although the parties discussed the requested continuance and its denial during oral argument, there is no written request for a continuance contained in the certified record or reflected on the docket.

At argument, Mother's counsel argued that, even though she did not file a brief, Mother's challenges to the sufficiency of the evidence in her appeal raised those issues before the court. After further discussion about the continuance request and whether Mother's counsel could argue in support of the appeal because Mother did not file a brief, common pleas indicated that one of its concerns is the District not knowing what challenges Mother would be raising, beyond the sufficiency of the evidence challenges raised in her appeal and, again, denied the continuance. (Id. at 94b-95b, 97b-102b, 111b.) Common pleas allowed Mother's counsel to argue the evidentiary challenges asserted in her appeal. Mother's counsel agreed that "she had every opportunity to present her own information and chose not to do so" but argued that the Board's findings were not supported by substantial evidence and there were issues of law that she did not know to assert at the hearing that should be addressed. (Id. at 103b, 107b-08b.) Common pleas issued its Order, dated January 29, 2016, stating that a complete record had been

9

made at the April 15, 2015 hearing and that argument was limited to those evidentiary issues raised in Mother's appeal; to do otherwise would be prejudicial to the District. (Common pleas Order.) Common pleas concluded that the record supported the findings of fact, and it affirmed the Adjudication. Mother now appeals to this Court.[13]

## IV. Issues Before this Court

*A. Whether common pleas abused its discretion in denying a continuance and limiting argument only to the issue raised in Mother's appeal.*

Mother argues common pleas should have granted her a one-week continuance to allow her recently-acquired pro bono counsel the opportunity to submit a brief on the complex legal issues for common pleas' review. Similarly, she contends that, notwithstanding the lack of brief, common pleas should have permitted Mother's counsel to raise certain legal issues at oral argument. These issues include that: (1) the Board improperly placed the burden of proof on Mother at the disenrollment hearing; and (2) the Hearing Officer did not assist Mother to ensure that all issues relevant to a residency determination were fully

---

[13] A school board is a local agency and its "final decision . . . is an adjudication subject to review by this Court pursuant to Section 754 of the Administrative Agency Law, 2 Pa. C.S. § 754." Monaghan v. Bd. of Sch. Directors of Reading Sch. Dist., 618 A.2d 1239, 1241 (Pa. Cmwlth. 1992) (footnote omitted). Here, common pleas did not take any additional evidence and, therefore, we apply the well-settled principle that:

> [w]here a local agency develops a complete record and [common pleas] takes no additional evidence, our scope of review is limited to whether the local agency's adjudication violated appellant's constitutional rights, committed error of law or violated provisions of the local agency law, or made findings of fact necessary to support its adjudication which were not supported by substantial evidence.

Id.

examined. Mother asserts that the District would not have been prejudiced by either the continuance or by allowing argument on those issues as there would have been minimal expense to the District as a result of the continuance. Mother argues that the denial of the first-time, one-week continuance was an abuse of discretion. Nerkowski v. Yellow Cab Co. of Pittsburgh, 259 A.2d 171, 173 (Pa. 1969). Mother asserts, in the alternative, that the matter should be remanded in order to make a complete record and address these asserted legal errors.

The District responds that Mother waived the arguments regarding any of the alleged error of laws set forth in her brief to this Court because they were not included in her appeal from the Adjudication and are raised for the first time in Mother's appeal to this Court. Rule 302(a) of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.") The District further argues that common pleas properly exercised its discretion in denying the continuance because the requirements for granting a continuance, discussed in Birdsall v. Carbon County Board of Assessment and Revision of Taxes, 649 A.2d 740, 742 (Pa. Cmwlth. 1994), were not met. Moreover, the District argues that a remand is not necessary because a full and complete record was made before the local agency. Section 754 of the Local Agency Law, 2 Pa. C.S. § 754 (addressing a court of common pleas appellate review in cases where there is a complete record versus an incomplete record). Both the District and Mother were provided with the opportunity to present evidence at the disenrollment hearing, they both examined the witnesses, and they both introduced documentary evidence into the record.

We first examine the District's contention that the legal issues should not be addressed by this Court because they are waived under Rule 302(a). A review of

11

Mother's brief indicates that she is not asserting them to this Court for our review, but to explain why common pleas abused its discretion in not granting her a continuance to file a brief and/or address them in oral argument.[14] We will therefore confine them to that context only.

We next consider common pleas' denial of Mother's request for a continuance. "The grant or refusal of a request for a continuance is *within the discretion of [common pleas]* and only where such discretion has been abused will the refusal of a continuance be reversed." Birdsall, 649 A.2d at 743 (emphasis added). Such decision "is an inherent power of a [common pleas] court," In re Right of Way for Legislative Route 1023, 406 A.2d 819, 821 (Pa. Cmwlth. 1979), and common pleas courts are entitled to deference "in their urgent and rightfully prioritized quest to expedite the matters before them," Cheng v. Southeastern Pennsylvania Transportation Authority, 981 A.2d 371, 378 (Pa. Cmwlth. 2009). "Four factors are used to determine whether a continuance was properly denied: (1) whether the delay prejudiced the opposing party; (2) whether opposing counsel was willing to continue the case; (3) the length of the delay requested; and (4) the complexities involved in presenting the case." Birdsall, 649 A.2d at 743. In Birdsall, we affirmed the denial of the defendant's continuance request as untimely

---

[14] However, it is well settled that an appellate court will not reverse an order based on a theory that was not presented to common pleas and raised for the first time on appeal. Kimmel v. Somerset Cnty. Comm'rs, 333 A.2d 777, 779 (Pa. 1975); Perin v. Bd. of Supervisors of Washington Twp., 563 A.2d 576, 580-81 (Pa. Cmwlth. 1989); Seneca Mineral Co., Inc. v. McKean Twp. Zoning Hearing Bd., 556 A.2d 496, 500 (Pa. Cmwlth. 1989). Similarly, common pleas cannot consider an issue not raised in the appeal from the local agency adjudication. Carroll Sign Co., Inc. v. Adams Cnty. Zoning Hearing Bd., 606 A.2d 1250, 1255 (Pa. Cmwlth. 1992). A review of the record confirms that the legal issues Mother argues in her brief and asserts as a basis for a remand were not raised in her appeal from the Adjudication to common pleas. Thus, these issues were not preserved for review by common pleas.

12

where it was made during the hearing and after the plaintiffs presented their case. Id. at 744. In doing so, we noted that the defendant was aware *two weeks before* the hearing of its need for rebuttal evidence, but it did not request a continuance as soon as it learned of the new information. Id. The refusal to grant a continuance is not an abuse of discretion where it is apparent that the requesting party has not exercised due diligence related to the reason for the continuance request. Carey v. Phila. Transp. Co., 237 A.2d 233, 235 (Pa. 1968). Applying the Birdsall factors here, we conclude that common pleas did not abuse its discretion in denying the continuance.

First, the District had already expended time and money in moving this appeal forward, including obtaining a date for oral argument, filing a brief addressing the issues set forth in Mother's appeal from the Adjudication, and preparing for the long-scheduled oral argument. Mother made no effort to move her appeal forward after filing it on May 29, 2015, and the District was the party to request oral argument on July 24, 2015, which was granted on September 23, 2015. Granting the continuance would require the District to make additional efforts in time and money to review a new brief and prepare, again, for oral argument. More importantly, common pleas concluded that granting the continuance would allow Mother "*to raise issues beyond those found in her initial filing*" and this would be prejudicial to the District. (Order at 2 (emphasis added).)

Second, the District was not willing to continue the case. Third, although the period of the delay was relatively short, one week, the request occurred merely one day before the oral argument, which had been scheduled for four months. Mother filed her appeal on May 29, 2015, almost eight months before the oral argument was scheduled to occur. We recognize that obtaining pro bono counsel

13

can be difficult; however, we cannot say that there was due diligence related to the continuance request where there was an eight-month delay in obtaining counsel, and in waiting until the day before oral argument, which had been scheduled for four months, to request the continuance. (S.R.R. at 96b.)

Fourth, although Mother asserts that this matter involves complex legal issues that should have been briefed and argued to common pleas, described in Mother's brief to this Court as the Hearing Officer improperly placing the burden of proof on Mother and that the Hearing Officer had an obligation to assist Mother at the hearing to develop the necessary record but did not do so, the only issue raised in her appeal from the Adjudication was that the findings of fact were not supported by substantial evidence. This was not a particularly complex issue and Mother's counsel did raise and argue this issue during the scheduled oral argument before common pleas, notwithstanding the lack of ability to file a brief. Notably, in arguing that a continuance should be granted, Mother's counsel did not assert to common pleas that a continuance was necessary to brief the issues, that the burden of proof was improperly placed on Mother, or that the Hearing Officer had to assist Mother at the hearing.[15] At one point, common pleas indicated that the District only had to prove that she was not living in the District, and Mother's counsel agreed and argued that the District did not do this. (Id. at 106b-07b.) Further, the certified record does not contain the initial continuance request of January 26, 2016, so we are unable to determine what, if any, issues were asserted therein as bases for granting the continuance. Given common pleas' discretion, the lack of

---

[15] Mother's counsel did argue that there was a question regarding whether Ms. Durham was caring for Children gratis, which would have allowed them to be enrolled in the District under a different provision of Section 1302 of the School Code, but that Mother did not raise it before the Board because she would not know to do so. (S.R.R. at 107b.)

14

argument to common pleas regarding the legal issues Mother's counsel now asserts would have warranted a continuance, and the limited issue raised in Mother's appeal, common pleas did not abuse its discretion in denying the requested continuance and limiting argument to the issue raised in her appeal.

Nerkowski does not require a different result. In that case, the defendant's primary attorney was appointed to be a common pleas' judge six days before the matter was scheduled to go to trial, and the defendant chose another attorney from the same law firm to represent it at trial. Nerkowski, 259 A.2d at 172. That attorney was already scheduled for a trial three days before the scheduled trial, and, on the day of the trial, the attorney requested, without opposition, that the judge hold this case for one week or until his previously scheduled trial finished. Id. The judge denied the request, and the trial proceeded without any defense counsel, the defendant, or defense witnesses. Id. at 173. After losing, the defendant appealed challenging, *inter alia*, the denial of the continuance request. Id. Pointing to the unusual factors involved, the shortness of the delay, the lack of objection by the plaintiff, the unanticipated appointment of the original attorney to the bench, and the lack of any real prejudice to the plaintiff, our Supreme Court held that the judge did abuse his discretion in denying the continuance request. Id. Other than the period of the requested delay, there are no similar "unusual" circumstances in this matter when compared to those in Nerkowski.

B. *Whether the findings of fact regarding Mother's residing outside of the District are supported by substantial evidence.*

Mother argues that the necessary findings of fact made by the Board upon which it based its conclusion that Mother did not reside in the District and decision to exclude and expel Children from the District are not supported by substantial

evidence. Mother asserts that the Board's critical findings that she resides on North Charlotte Street in the Pottstown School District and that she did not submit the required residency paperwork are not supported by the record, a fact the District admits in its brief. By contrast, Mother maintains that the evidence presented supports the finding that she resides at the District Address, rather than some other location outside the District. Mother asserts that the record, when taken as a whole, does not contain rational support for the Board's finding that she does not reside at the District Address. Emporium Water Co. v. Pa. Pub. Util. Comm'n, 955 A.2d 456, 463 (Pa. Cmwlth. 2008).

Mother also argues that In re Residence Hearing Before Board of School Directors, Cumberland Valley School District, 744 A.2d 1272 (Pa. 2000) (Cumberland Valley), and Paek v. Pen Argyl Area School District, 923 A.2d 563 (Pa. Cmwlth. 2007), do not require a different result because, in those cases, there were two addresses that were compared to each other to determine which was the parents' residence. Here, Mother argues, there was no alternative residence that would be supported by substantial evidence and, therefore, there was nothing against which to compare the District Address to determine which residence was Mother's.[16]

The District responds that Mother's evidence is insufficient to establish that she resided at the District Address because she did not establish that she maintained an actual physical presence at that address and merely using that

---

[16] Alternatively, Mother argues that if we do not reverse common pleas' Order, then the Court should remand the matter pursuant to Section 706 of the Judicial Code, 42 Pa. C.S. § 706 (providing, *inter alia*, that "[a]n appellate court may . . . remand the matter . . . or require such further proceedings to be had as may be just under the circumstances"), because the record is not complete because there are "glaring gaps in the record." (Mother's Reply Br. at 19.)

16

address to receive mail, or a driver's license, or for a bank account is insufficient to establish residency under Section 1302(a), the purpose of which is to avoid "school shopping." Paek, 923 A.2d at 567. The District argues that, when viewed in the light most favorable to it as the prevailing party, its evidence supports the finding that Mother does not reside in the District and Mother is simply asking this Court to credit her evidence over the District's evidence. The District further asserts that it had no obligation to provide an alternative address for Mother, and thus, the finding that Mother resided at North Charlotte Street is not essential to the Board's determination. The District argues that, in Paek, this Court has held that an individual was not a resident of a school district despite that individual presenting more evidence than Mother did, and we should conclude likewise here. Id. at 566-67.

Section 1302(a) of the School Code sets forth the residency requirements for free attendance at public schools and states, in relevant part, that "[a] child shall be considered a resident of the school district in which his parents or the guardian of his person resides." 24 P.S. § 13-1302(a). "Residence" for the purpose of Section 1302(a) is "a factual place of abode evidenced by a person's physical presence in a particular place" but it does not have to be the person's principle residence or domicile. Cumberland Valley, 744 A.2d at 1274-75. The purpose of Section 1302(a) is to prevent "school shopping." Paek, 923 A.2d at 567. In the cases addressing "residency" under Section 1302(a), Cumberland Valley, Behm v. Wilmington Area School District, 996 A.2d 60 (Pa. Cmwlth. 2010), Paek, and Pawlosky v. Fort Cherry School District (Pa. Cmwlth., No. 2811 C.D. 1999, filed

17

July 21, 2000),[17] there was evidence establishing another address outside the school district where the school districts claimed the parents resided. While these cases do not specifically include this factor in the residency analysis, they generally compared the parents' physical presence at one location to their physical presence at the second location to determine which location was the parents' residence for the purpose of Section 1302(a).

"[T]he *sole* purpose [of a residency hearing is] to ensure that sufficient evidence exist[s] to *substantiate [a school district's] determination* that [the parents] were not residents" of the school district. Behm, 996 A.2d at 66 (emphasis added). Thus, the issues here are whether there is substantial evidence to support the Board's findings and conclusion that Mother did not reside within the District as required by Section 1302(a) and whether that evidence substantiates the Board's determination that Mother does not reside in the District. Substantial evidence is "evidence that a reasonable mind might accept as sufficient to support a conclusion." Spencer v. City of Reading Charter Bd., 97 A.3d 834, 842 (Pa. Cmwlth. 2014). "[A]ppellate review must focus on whether there is rational support in the record, when reviewed as a whole, for the agency action." Republic Steel Corp. v. Workmen's Comp. Appeal Bd. (Shinsky), 421 A.2d 1060, 1063 (Pa. 1980). "When performing a substantial evidence analysis, the court must view the evidence in the light most favorable to the party that prevailed before the fact finder." Bonatesta v. N. Cambria Sch. Dist., 48 A.3d 552, 558 (Pa. Cmwlth. 2012). It is for the school board, not the court, to assess the credibility of the

---

[17] Pursuant to this Court's Internal Operating Procedures, an unreported opinion of this court issued after January 15, 2008, may be cited "for its persuasive value, but not as binding precedent." 210 Pa. Code § 69.414(a).

witnesses. <u>Hickey v. Bd. of Sch. Dir. of Penn Manor Sch. Dist.</u>, 328 A.2d 549, 551 (Pa. Cmwlth. 1974). "However, a court will 'overturn a credibility determination if it is arbitrary and capricious or so fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render it irrational.'" <u>Bonatesta</u>, 48 A.3d at 558 (quoting <u>Agostino v. Twp. of Collier</u>, 968 A.2d 258, 263-64 (Pa. Cmwlth. 2009)).

Initially, we note that although Mother would have liked to argue that she did not bear the initial burden of proof, this issue was not raised in her appeal to common pleas and, therefore, it is waived.[18] Pa. R.A.P. 302(a). However, given the important right to education implicated in these proceedings and that the purpose of a residency hearing is to ensure that the school district's determination of non-residency is supported by sufficient evidence, <u>Behm</u>, 996 A.2d at 66, we conclude, at least here, that this initial burden of proof may be satisfied by the presentation of evidence that would be sufficient to satisfy the requirements for enrolling a child in the District in the first instance. After this is established, the burden then shifts to the District to present evidence "to substantiate [its] determination that [Mother is] not [a] resident[]" of the District. <u>Id.</u> Here, the Board concluded that "Mother provided proof of residency documentation in accordance with" the Department's guidelines set forth in its BEC on Enrollment.[19]

---

[18] The precedent in these matters is not clear on which party bears the burden of proof. However, because this issue is not before us in the present matter, we will not address it further.

[19] The Department's "BEC on Enrollment of Students" states that

> acceptable documentation [of proof of residency] includes: a deed, a lease, current utility bill, current credit card bill, property tax bill, vehicle registration, driver's license, DOT identification card. A district may require that more than one form of residency confirmation be provided. However, school districts and

**(Footnote continued on next page…)**

19

(COL ¶¶ 8, 10.) And, the District now appears to acknowledge that the paperwork Mother presented could have satisfied her initial burden of proving residency in order to enroll Children in the District in the first instance. (District's Br. at 34.) Moreover, Children were actually enrolled in and attending school in the District, which, as Ms. Oxenford testified, would not have occurred absent the proper paperwork. (S.R.R. at 15b-16b.) Accordingly, Mother satisfied her burden of proof, and the burden then shifts to the District to substantiate its claim that Mother is not a resident.

The Board relied upon a variety of findings of fact to conclude that Mother does not reside in the District, and we address these findings separately to determine whether they are supported by substantial evidence and whether they "substantiate [the District's] determination that [Mother is] not [a] resident[]" of the District. Behm, 996 A.2d at 66.

First, the Board found that not all of the required Forms had been completed and submitted for Children prior to start of the 2014-2015 school year. (FOF ¶¶ 4, 8-10.) A review of the record reveals that these findings are not supported by substantial evidence. The Board relied on Ms. Oxenford's testimony that there was no Form for the 2014-2015 school year. (S.R.R. at 15b.) However, Ms. Oxenford also testified that, although she had not found the Form, she "was still searching" for it at the time of the hearing, and that it "probably exist[ed] somewhere" because Younger Child was, in fact, enrolled in kindergarten and

_____

        charter schools should be flexible in verifying residency, and should consider what information is reasonable in light of the family's situation.

(COL ¶ 8 (internal quotation omitted).)

would not have been enrolled had the Forms not been submitted to the District. (S.R.R. at 16b.) Ms. Oxenford also acknowledged that Ms. Durham did submit a Form on July 2, 2014 that listed Children as residing at the District Address, agreed that there are "many forms that c[a]me in," and that, in addition to this July 2, 2014 Form, it was "possible" that Younger Child was listed on another Form, which she had not found. (Id. at 15b, 17b.) Moreover, although Ms. Oxenford testified that the July 2, 2014 Form did not list the names of the parents of the children who lived at the District Address, that Form did include a statement on the attached paper that "attest[s] . . . that [the] parents – [of those] children live [at] [the District Address]. Did not want to change original notarized form." (Id. at 15b, 43b-44b.) Reviewing this testimony and evidence in its totality, we conclude that a "reasonable mind [would not] accept [it] as sufficient to support a conclusion," Spencer, 97 A.3d at 842, that no Forms had been filed for the 2014-2015 school year and, therefore, those findings are not supported by substantial evidence.

In finding of fact 13, the Board found that Investigators "conclude[d] that Mother resides in the borough of Pottstown on North Charlotte Street." (FOF ¶ 13.) The Board also found, in reference to the Walking Incident, that the District "[A]ddress is not within reasonable walking distance from the school where North Charlotte Street could be, albeit far." (Id. ¶ 18.) The District acknowledges that the Hearing Officer's finding of fact 13 in this regard was a mistake, but contends that this finding was not essential to the Board's decision. (District's Br. at 26 n.3.) Our examination of the record discovered no support for a finding that Mother resides at North Charlotte Street. Investigators' report does not conclude that Mother resides at North Charlotte Street; rather, it states that the car Mother

was seen driving to the District Address was registered to "an address in Pottstown Borough." (S.R.R. at 50b-51b.) That report lists several addresses for Mother, including the District Address, but not North Charlotte Street. (Id. at 50b.) Mr. Gordon testified that he surveilled the North Charlotte Street address and saw the car there, but he never observed Mother at that location. (Id. at 18b.) Although the District now asserts that this finding is not essential, we disagree. The District specifically questioned Mr. Gordon and Ms. Slack about the North Charlotte Street address in an effort to establish it as an alternative address for Mother outside the District. (Id. at 18b-20b.) The District then attempted to bolster its conclusion that Mother resides at North Charlotte Street by finding that this address, but not the District Address, could be walked to from Children's elementary school. (FOF ¶ 18.) Because the findings referencing North Charlotte Street as Mother's residence are essential, but are not supported by substantial evidence, they should not have been relied upon by the Board.

The Board also relied upon a series of anecdotes and attendance "issues," as well as the surveillance by its social workers, which it asserts constitute substantial evidence to support its finding that Mother does not reside at the District Address. In finding of fact 16, the Board found that Ms. Slack and Ms. Rakoff did not see Mother at the District Address during their investigation. (Id. ¶ 16.) However, both witnesses testified that while they surveilled the District Address "on a number of occasions" between May and September,[20] they did so *only* around the time the buses came to pick up and drop off students. (S.R.R. at 20b-21b.) On those days, they saw Children go to the bus stop accompanied by older children,

_____

[20] We note that the time period between May and September includes months where school is not in session.

but did not observe Mother at the District Address. (Id.) While this testimony would support a finding that Mother does not walk Children to or from the bus stop on school days, we disagree that it constitutes substantial evidence that Mother does not reside at the District Address because it focused only on a limited time frame.

In finding of fact 18, the Board found that the District "[A]ddress is not within reasonable walking distance from the school where North Charlotte Street could be, albeit far." (FOF ¶ 18.) The record shows, however, that Ms. Lloyd stated that the walk from the Children's elementary school to the District Address was "doable if you're determined to walk" "but . . . it would at least take over an hour to walk there." (S.R.R. at 22b.) Ms. Lloyd offered no testimony regarding the walk to North Charlotte Street, but Ms. Slack testified that one could "[n]ot easily" walk from any of the District's schools to North Charlotte Street. (Id. at 20b.) Reviewing this testimony, we conclude that it does not support the finding the District Address *was not* a reasonable walking distance from Children's elementary school, but that the North Charlotte Street address *could be*.

In finding of fact 19, the Board found that "it was evident that the children live with the Mother at an address other than at [the District Address]" because of: the Tardy Incident, when "Mother was dropping them off late to school . . . [and Ms.] Durham called to confirm that the children were in school, not knowing where the children were"; and the Cereal Incident. (FOF ¶ 19.) Although Children's attendance records suggest that both were tardy on the day of the Tardy Incident, Ms. Lloyd's testimony and her contemporaneous email indicate that *Younger Child* was late that day and that Ms. Durham called about *his absence*, not about both Children as the Board found. (S.R.R. at 22b, 53b, 58b.) This deviation

23

from the evidence is important because the Board concentrated, in another finding, on the opinion of Ms. Rakoff that, in non-resident situations, *all* the children involved would be absent or tardy because they would be riding together. (FOF ¶ 20; S.R.R. at 21b.) Additionally, Ms. Lloyd agreed that "it [was] a possibility" that Ms. Durham simply "was not home that morning" to know that Younger Child was late for school "[o]r that someone else took him to school." (S.R.R. at 23b.) As for the Cereal Incident, Ms. Lloyd agreed with the District's counsel that this *suggested* that Children had clothes elsewhere. (Id. at 22b-23b.) However, Ms. Lloyd agreed that it was possible that "their clothes could [just] be dirty," but she thought that "there would be another pair of pants, or a shirt . . . for them to change to get to school." (Id. at 23b.) Because the Board's finding that *both* Children were late and that Ms. Durham called about *both* Children is not supported by the record and Ms. Lloyd agreed that issues not related to residency could have caused these incidents, we disagree that this evidence constitutes substantial evidence to support the finding it is "evident"[21] that "[C]hildren live with the Mother at an address other than at [the District Address]." (FOF ¶ 19.)

Finally, in finding of fact 20, the Board found that Children's attendance patterns were "almost identical with each other and are consistent with non-resident students as they are frequently absent or late and both do not come even though the bus runs to the address in the District." (Id. ¶ 20.) Ms. Rakoff testified that Children's attendance pattern suggested "some residency concern," and Children's attendance records do indicate that both Children were absent or tardy on some of the same days. (S.R.R. at 21b, 58b.) This evidence does support the

---

[21] "Evident" is defined as "clear to the understanding: OBVIOUS, MANIFEST, APPARENT" or "CONCLUSIVE." Webster's Third New International Dictionary 789 (2002).

Board's finding; however, this finding and evidence, alone, are insufficient to substantiate the Board's determination that Mother does not reside at the District Address.

We acknowledge that when compared to the evidence presented in Cumberland Valley, Behm, and Paek[22] there is not much evidence regarding Mother's presence at any address, let alone at the District Address. However, there is no alternative address here that can be supported by substantial evidence against which Mother's physical presence, or the documentary evidence, can be compared to determine where Mother "resides" for the purpose of Section 1302(a). The evidence establishes that Children have been consistently seen at the District Address and Mother has been observed physically present only at the District Address. Moreover, all of the documentary evidence, including all of the correspondence from the District, points to that address as Mother's residence. This includes the Adjudication and letter from the Board, which were sent certified mail, to the District Address, for which Mother signed. (FOF ¶ 21; S.R.R. at 13b,

---

[22] In Cumberland Valley, the mother moved to a townhome in the school district with her two sons in order to be closer to the private school one of the sons attended, while the father remained at the family's other address outside the school district. Cumberland Valley, 744 A.2d at 1273. It was apparent from the evidence that they stayed in the school district townhome night and day, they received mail and phone calls there, and they kept clothes, books and supplies there. Id. at 1275. In Behm, the parents presented testimony "regarding the time spent, and activities pursued by, the family at" the school district and non-school district addresses, and a private investigator, neighbors of the district address, and the school district's superintendent testified regarding their observations of the family. Behm, 996 A.2d at 62. In Paek, the parent attempted to prove that she resided at the school district address through her testimony that she was at that address every day, people visited her there, and she used that address on her driver's license, for a bank account in which her paychecks were deposited, and she received electric bills for that address in her name. Paek, 923 A.2d at 564. However, her testimony also revealed that she "spen[t] very little time at that address compared to the amount of time spent at the [second non-school district] address." Id. at 567.

90b-91b.)  Although the District is correct that this Court, in <u>Paek</u>, did not find that the documentary evidence presented was sufficient to establish the parent's residency, in that case there was evidence of an alternative address against which the parent's physical presence and the documentary evidence could be compared. <u>Paek</u>, 923 A.2d at 565-66.

This matter is unlike in <u>Behm</u> and <u>Pawlosky</u>.  In <u>Behm</u>, the school district presented testimony from multiple witnesses, including neighbors,[23] that compared the time spent at the relevant addresses and offered documentary evidence that the tax assessment record for the school district address noted a change of mailing address from that address to the non-school district address.  <u>Behm</u>, 996 A.2d at 62.  Similarly, in <u>Pawlosky</u>, there was testimony of numerous witnesses, including neighbors, that the family lived at the address not located in the school district, and the majority of the documentary evidence not associated with the family's litigation with the school district used that address as the parents' address.[24] <u>Pawlosky</u>, slip op. at 2-3.

---

[23] We note that although several of the District's witnesses testified about their conversations with neighbors, this testimony is uncorroborated hearsay, and, therefore, would not have supported a finding of fact.  <u>Walker v. Unemployment Comp. Bd. of Review</u>, 367 A.2d 366, 370 (Pa. Cmwlth. 1976) ("[h]earsay evidence, [a]dmitted without objection, will be given its natural probative effect and may support a finding . . . [i]f it is corroborated by any competent evidence in the record, but a finding of fact based [s]olely on hearsay will not stand"); <u>see</u> <u>also</u> <u>City of Phila. v. Civil Serv. Comm'n</u>, 879 A.2d 146, 153-54 (Pa. 2005) (holding that the <u>Walker</u> rule applies "in a variety of other agency proceedings" where an agency's own regulations are silent on hearsay rules).  We note that the Adjudication did not include any findings based on these hearsay statements.

[24] In <u>Pawlosky</u>, the parents owned two homes, one in the school district and one not, and the school district requested a residency hearing.  The school district presented the testimony of various witnesses who "testified that based upon their observations, [the family] lived at the [non-school district] address and/or that they did not live [at the school district address]." <u>Pawlosky</u>, slip op. at 2.  The school district also presented copies of numerous records, including tax returns, employment records, and voting records, as well as their prior driver's licenses, all of **(Footnote continued on next page…)**

There must be substantial evidence in the record to support the Board's findings of fact and its conclusion that Mother is not a resident of the District. Many of the Board's findings are either not supported by substantial evidence or are based on evidence that simply suggests or speculates that there *could be* a "residency concern" or "issue." (S.R.R. at 21b-22b.) Where a school district excludes children from attendance at its schools based upon the parent(s) non-residency, which also may potentially result in, among other things, criminal charges and having to repay the school district for the education the children have received,[25] substantial evidence of that non-residency is required in order "to substantiate [a school district's] determination that [a parent is] . . . not [a] resident[]" of the school district. Behm, 996 A.2d at 66. Because the District did not present such evidence, it did not substantiate its determination regarding Mother's non-residency.

Accordingly, we reverse common pleas' Order affirming the Board's Adjudication.

_____
**RENÉE COHN JUBELIRER,** Judge

_____
**(continued…)**
which used the non-school district address. Id., slip op. at 3. Other than a prepared statement by the father read by parents' counsel, the parents presented no evidence. Id.

[25] See Section 1302(c) of the School Code, 24 P.S. § 13-1302(c) (providing, *inter alia*, that "a person who knowingly provides false information in the sworn statement for the purpose of enrolling a child in a school district for which the child is not eligible commits a summary offense" and "shall be liable to the school district for an amount equal to the cost of tuition").

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Marleittia Whitacker-Reid, | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 371 C.D. 2016 |
| | : | |
| Pottsgrove School District, Board of School Directors | : | |
| | : | |

# **O R D E R**

NOW, February 9, 2017, the Order of the Court of Common Pleas of Montgomery County, entered in the above-captioned matter, is hereby **REVERSED**.

_____

**RENÉE COHN JUBELIRER,** Judge